UNITED STATES *v.* SICKEL (No. 1494).[1]

1. FREE ENTRY UNDER R. S. 2797, AS AMENDED MARCH 3, 1897.
    Under this section goods to be entitled to free entry must be legitimate equipment of a vessel belonging to a regularly plying line, delayed in port, this equipment to be transferred, under supervision, from another vessel of the same line.
2. STEAM WINCHES.
    These steam winches were to be installed by way of equipment, making the vessel ready for service differing from its previous service. They were not in the statutory sense an equipment of the vessel, but rather for the vessel, and they were not entitled to free entry.

United States Court of Customs Appeals, May 3, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7639 (T. D. 34925).

[Reversed.]

*Bert Hanson,* Assistant Attorney General (*John J. Mulvaney,* special attorney, on the brief), for the United States.
*Walden & Webster* for appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

It appears from the record in this case that eight steam winches brought into the country by the Hamburg-American steamship *Pretoria* and transferred at the port of New York to the *Carl Schurz* and *Emil L. Boas,* steamships of the same line which were there undergoing extensive alterations in contemplation of a change of service, were classified as steam engines and assessed for duty at 30 per cent ad valorem under that part of paragraph 197 of the tariff act of 1909, which reads as follows:

197.  * * *  All steam engines, thirty per centum ad valorem;  * * *.

The importer claimed that the steam winches were part of the equipment of the vessels to which they were transferred and that they

were therefore free of duty under the navigation laws (R.S. 2797) as amended by section 17 of an act approved March 3, 1897 (29 Stat. at L., 691), which said section, in so far as pertinent, reads as follows: ·

SEC. 17. \* \* \* Sea stores and the legitimate equipment of vessels belonging to regular lines plying between foreign ports and the United States delayed in port for any cause may be transferred in such port of the United States under the supervision of the customs officers from one vessel to another vessel of the same owner without payment of duties, but duties must be paid on such stores or equipments landed for consumption, except American products.

The Board of General Appraisers sustained the protest and the Government appealed.

To entitle such goods to free entry under section 17 they must meet the following prescribed requirements: First, they must be equipment of a vessel *delayed in port* and belonging to a regular line plying between foreign ports and the United States; second, they must be the *legitimate* equipment of such vessel—that is to say, equipment prudent to provide and reasonably necessary for the proper, efficient, and safe performance of the service in which the vessel is engaged or is about to engage; third, they must be transferred in the port in which the vessel is delayed, from one vessel to another of the same owner, under customs supervision.

It is not disputed that the *Pretoria*, the *Carl Schurz*, and the *Emil L. Boas* are vessels of the same owner and belong to a regular line plying between foreign ports and the United States. The evidence is uncontradicted that the *Carl Schurz* and the *Emil L. Boas* were, at the time the application was made to the collector for transfer of the winches, delayed in port undergoing alterations to fit them for a service different from that in which they had been theretofore engaged. It appears from the testimony that at the time of the entry of the winches application was made to the collector by the Hamburg-American Line for the transfer of the winches from the steamship *Pretoria* to the *Carl Schurz* and the *Emil L. Boas* without the payment of duties. The Treasury Department ruled that the winches were not legitimate equipment, but machinery of the vessels, and accordingly the application for transfer without payment of duties was refused, whereupon the duties were paid under protest and the winches installed in the port of New York on the vessels for which they were imported. If, as a matter of fact, the winches were such legitimate equipment as is contemplated by the statute, neither the collector nor the Treasury Department could defeat their right to free entry by refusing customs supervision to the transfer requested. The importer having himself done all that the law required of him, and the collector having declined to furnish customs supervision of the transfer as requested by the importer, the case must be treated as if the transfer had been actually made under such supervision. United States *v.* Legg (105 Fed., 930, 933).

With this as the state of the case, there is really but one question presented by the appeal, and that is, Were the winches at the time application was made for their transfer legitimate equipment of the *Carl Schurz* and *Emil L. Boas?* We think they were not. Prior to the arrival of those vessels in port they were not equipped with steam winches, and as the steam winches under consideration were never on board of the *Carl Schurz* or *Emil L. Boas* until transferred from the *Pretoria*, it can not be said that before such transfer they constituted any part of the equipment of either vessel. The fact that it was proposed to equip the delayed vessels with winches and thereby add to their efficiency in handling cargo in their new line of service might constitute the winches equipment *for* the vessels, but not equipment *of* the vessels, and in no proper sense of the term could either vessel be said to be equipped with the winches until the winches actually became identified with the vessel, not as part of it, but as appurtenances prudent to provide and reasonably necessary for the vessels considering the service in which they were about to engage.

For a long time prior to section 17 it was well settled that the bona fide equipment of a particular vessel, like the vessel itself, was duty free. *The Conqueror* (166 U. S., 110, 113). Equally well settled was the principle that equipment imported into the United States for a vessel or put on board of a vessel for the first time by transfer in an American port from some other vessel, even of the same owner, was subject to duty. T. D. 657, T. D. 1407, T. D. 9962, T. D. 11220, T. D. 11629, Opinions of Attorney General (Vol. XX, p. 194).

The policy of imposing duty on necessary equipment imported for some particular vessel or transferred to it from some other vessel of the same line for any cause may well be doubted when it is considered that the very same equipment, if installed abroad, may be brought into the country free of duty. Nevertheless, when it came to the passage of section 17 Congress does not seem to have concerned itself with the equipment imported for the use of a particular vessel or the unlimited transfer of equipment from one vessel to another even of the same owner, but with the transfer of equipment belonging to *vessels delayed in port,* and to that equipment and that transfer the operation of the section was expressly limited. If the expression "equipment of vessels delayed in port" could be construed to mean equipment *for* vessels delayed in port, then the winches in question might be held to be within the intention of the provision, but that construction we can not make, in view of the fact that no such meaning properly attaches to the language which Congress chose to employ. Indeed, that Congress meant just what it said and intended to go no farther than to permit the transfer duty free of the legitimate sea stores and equipment of delayed vessels is, we think, fully borne out by the report made to the House of Repre-

sentatives by the Committee on Merchant Marine and Fisheries, in which the reasons inducing a favorable recommendation of the section were stated as follows:

> Section 17 provides that sea stores may be transferred from one vessel to another belonging to one owner, under the supervision of customs officers, without the payment of duties. If the vessel is delayed in port from any cause, such stores are now exempt from duty as long as they remain on board the ship for which they were purchased. Accidents frequently require the substitution of one steamship for another in our Atlantic mail carrying and passenger service. The present law puts a petty obstacle in the way of the transfer of sea stores, without corresponding benefit to the Government.

A fair reading of that report leaves no room for doubt that the committee had in mind sea stores and equipment actually on board of a vessel delayed in port, not sea stores or equipment imported for her use. The unforeseen delay of a vessel in port would naturally interfere with the regularity of the service in which she was engaged, and the recommendation of the committee indicates very clearly, we think, that the purpose of section 17 was to permit the transfer without payment of duty of sea stores and equipment belonging to a delayed vessel and not the transfer to the delayed vessel of sea stores or equipment imported for her use or belonging to some other vessel of the same owner not delayed in port. The report mentions sea stores only, but as the section recommended provided for both sea stores and equipment it is evident that the reasons given for permitting the free entry of sea stores were intended to apply to equipment as well. Section 17, in the form in which it was submitted by the committee, was adopted by the House and passed by the Senate, and we are unable to find that during its consideration either House contemplated the granting of free entry to any sea stores or equipment except the actual sea stores and the actual equipment of a delayed vessel transferred under customs supervision to some other vessel of the same owner.

The question as to whether legitimate sea stores and equipment temporarily separated from a vessel by accident or otherwise cease to be legitimate sea stores and equipment of the vessel for the purposes of section 17 is not involved in this case and is therefore not decided.

The decision of the Board of General Appraisers is *reversed.*