57 CCPA

**MAHER–APP & CO. et al., Appellants,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5324.**

United States Court of Customs
and Patent Appeals.

Dec. 4, 1969.

Rich, Acting C. J., and Lane, J.,
dissented.

Glad & Tuttle, Los Angeles, Cal., attorneys of record, for appellants. Edward N. Glad, Los Angeles, Cal., James J. Morrison, New Orleans, La., of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, New York City, Frederick L. Ikenson, U.S.Dept. of Justice, Customs Section, New York City, for the United States.

Before RICH, Acting Chief Judge, JONES, Judge, sitting by designation, and ALMOND, BALDWIN and LANE, Judges.

ALMOND, Judge.

Maher-App & Co., et al., importers, appeal from the decision and judgment of the United States Customs Court [1] overruling the eight consolidated protests against classification of the imported merchandise by the Collector of Customs for the Port of New Orleans,

---

1. 60 Cust.Ct. 470, C.D. 3429.

Louisiana. Involved in the protest are five and eight pound balls of henequen or sisal twine, described on the invoices as "binder twine," and assessed with duty at the rate of 15 per centum ad valorem under the provisions for cords and twines in paragraph 1005(b) of the Tariff Act of 1930, as modified by the

General Agreement on Tariffs and Trade, T.D. 51802. Appellants contend that the merchandise is entitled to entry free of duty as binding twine under the provisions of paragraph 1622 of said Act, as modified by Public Law 82–219, 65 Stat. 655 (1951).

The relevant statutory provisions are:

Paragraph 1005, supra:

Cords and twines (whether or not composed of three or more strands, each strand composed of two or more yarns), tarred or untarred, single or plied, wholly or in chief value of manila (abaca), sisal, henequen, or other hard fiber ........ 15% ad val.

Paragraph 1622, supra:

All binding twine, and twine chiefly used for baling hay, straw, and other fodder and bedding materials, manufactured from New Zealand hemp, henequen, manila, istle or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred and fifty feet to the pound ............ Free

---

The issue calling for resolution here is whether the instant importation constitutes such twine as falls within the description "binding twine" within the purview of said paragraph 1622 or, aided by the attendant presumption, constitutes a commodity as classified under paragraph 1005(b) by the Collector of Customs.

As noted by the court below, the question posed is by no means novel in the area of the construction and application of tariff legislation as evidenced by the deliverances of this and the Customs Court in such cases as: United States v. Geo. Wm. Rueff, Inc., 41 CCPA 95, C.A.D. 535 (1953); Bob Stone Cordage Co. v. United States, 51 CCPA 60, C.A.D. 838 (1964); Geo. Wm. Rueff, Inc. v. United States, 72 Treas. Dec. 290, T.D. 49151 (1937); Independent Cordage Co., Inc. v. United States, 3 Cust. Ct. 157, C.D. 223 (1939); Alberto Vales v. United States, 9 Cust.Ct. 219, C.D. 698 (1942).

In the *Geo. Wm. Rueff* case this court noted the comprehensive sweep of para-

graph 1622, holding that importations of baler twine approximating 200 feet to the pound and chiefly used for baling hay, came within the scope of the provision for "all binding twine." The decision indicated that paragraph 1622 would encompass all twine made from the material enumerated therein which did not exceed the limitation of 750 feet to the pound and chiefly used in the agricultural pursuit of tying grains or harvesting.

In the *Bob Stone Cordage* case this court affirmed the overruling of a protest asserting that merchandise invoiced as "binder twine" was such twine as was encompassed by paragraph 1622 on the principal ground of a failure to show that the uses of the importation were chiefly agricultural. The court's decision was predicated on a combination of factors, succinctly and fairly analyzed, we think, in the lower court's opinion in the instant appeal as follows:

First, plaintiffs' witnesses testified that twine which fell more than 5 percent below 500 feet to the pound

would not be acceptable as binder twine. Second, reports from Government chemists that samples of the merchandise in issue measured from 352 to 473 feet per pound were not disputed. Third, none of the witnesses could testify that the merchandise in issue conformed to the acknowledged standard of 500 feet per pound, nor could they state that nonconforming twine would consciously be used for binding purposes in farm operations. The court also was of the opinion that the witnesses lacked familiarity with the disputed importation and that the testimony concerning other binder twine did not cover a geographical area broad enough to support a showing of chief use.

A vital deficiency from the standpoint of appellants' proof in *Bob Stone Cordage* was a failure to correlatively adapt the testimony of its witnesses to the importation in issue which the record fairly indicated to be of a variety yielding less than 475 feet per pound and thus a class or kind other than standard binder twine.

The issues in *Bob Stone Cordage* bear striking similarity to those which confront us here. There, as here, no samples of the imported merchandise were before the court, the exhibits were all illustrative and no testimony was introduced that any of the goods imported actually went into agricultural use.

In the proceedings below in the instant case, plaintiffs introduced a formidable array of witnesses knowledgeable in their areas of endeavors. It may well be said that theirs was a valiant effort to meet the criteria of proof, lacking which proved fatal to plaintiffs in *Bob Stone Cordage*. As noted by the court below, the testimony of these witnesses with regard to recognized binder twine was related to four areas, viz., the events surrounding the classification of the twine, its manufacture and physical characteristics, the merchandising process and the use of the twine.

V. J. Peuler who, as customs line examiner at the port of New Orleans, had advisorily classified the merchandise in six of the eight consolidated protests herein was called for the purpose of adducing those factors which induced him to deny duty-free status to the items involved. As stated by the trial court, he "was unable to recall the details of these proceedings or to state to what extent the lengths per pound reported by the customs laboratory were determinative of his advisory classification."

A. E. Hodapp, chemist and chief of the Organic Division of the Customs Laboratory at New Orleans, stated that samples of items invoiced as binder twine were analyzed under his supervision for weight, oil content, and length per pound. He stated that plaintiffs' illustrative exhibits 1, 2, and 3 possessed certain characteristics of twine that measured five hundred feet per pound. However, the reports of the laboratory attached to the invoices on the entries involved herein reveal that the lengths of the sampled balls ranged from 379 to 473 feet per pound.

It is pertinent to here point out that plaintiffs' illustrative exhibits 1–5, inclusive, were simply representative of the general characteristics of that class of goods acknowledged as binder twine. They were not samples of the importation in issue nor was their length–weight ratio established.

Mixel J. Jacobo, foreign sales manager of an organization of Mexican cordage manufacturers, testified regarding the manufacture and physical characteristics of binder twine that it is single ply made of sisal or henequen fiber, oiled, treated with rodent and insect repellent and that while the nature of the manufacturing process made some fluctuations in the length-weight ratio unavoidable, it is nevertheless manufactured to yield 500 feet per pound and is understood to be 500 feet per pound. The testimony of the other trade witnesses generally coincided with that of Jacobo to the effect that when ordering binder twine it was

expected and supposed to yield approximately 500 feet per pound.

Plaintiffs' witnesses, nine in number, who were engaged in the importation and sale of binder twine were in substantial agreement regarding ordering and merchandising of twine. Those witnesses ordered the commodity with the understanding and expectation that they would receive twine which met the standard of 500 feet per pound and were of the view that a variation in length per pound greater than five percent would not satisfy normal agricultural requirements.

The record amply supports the conclusion that the importers of the twine in question never examined it. It simply entered the usual channels of commerce. None of them could testify that they had ever inspected the subject importation with the slightest degree of thoroughness. The record discloses that the instant twine was entered into the same commercial channels whether or not it was accorded duty free status. It was dispensed to twine wholesalers, large retailers, farm implement and feed dealers and farmer organizations. The record is replete with testimony relating to the end use of twine dispensed to those channels. The witnesses connected with its importation and sale agreed that it was used on the farm for binding and tying grains. Their statements were predicated on the fact that the outlet channels were such as supplied the needs of farmers or on personal observation of binding twine in use in roto balers during the course of their business travels. The witness De-Neal, for example, testified that he saw binder twine in use in a number of Midwestern states and that it resembled plaintiffs' illustrative exhibits 1 through 5, and that he knew of no use, other than agricultural, for such twine. The witness further stated that the measurement of twine that he had been familiar with as binder twine is 500 to 600 feet per pound.

The witness Edmund D. Stone testified that he was familiar with the use of binder twine similar to plaintiffs' illustrative exhibits 1 to 5 on his own and neighboring farms. He had seen it in use in the South and Midwest. He also stated that the binder twine in which he dealt was understood to yield 500 feet to the pound.

We find that the record supports the trial court's summary that the testimony of the remaining witnesses was in similar vein in the observation that:

Their familiarity with the use of binder twine was a result of their supervising its sale to wholesalers, distributors, and farm supply houses in various sections of the country. The twine they sold, to the best of their knowledge, fulfilled the expected length-weight ratio of 500 feet per pound in addition to possessing the other enumerated physical characteristics. As stated previously, however, none of the witnesses could testify that they had ascertained the length per pound of the instant twine or that they had seen the instant twine in use on farms.

We have made a searching and careful review of the record and find abundant support for the comments made by the court below and the conclusions reached as to the evidence adduced by the appellants. The Customs Court stated:

\* \* \* plaintiffs have marshaled an abundance of proof relating to binder twine in what can best be described as its commercially acceptable form. In this form, the twine is expected to possess certain physical qualities, among which is the requirement that it measure 500 feet per pound. The testimony reveals that this characteristic is expected by the importers, sellers, and ultimate users and is the standard aimed for by the manufacturer. Consequently, it appears that the requisite yield of twine per pound is a major characteristic of binder twine as a class, absent which such twine will not be acceptable for the uses testified to by plaintiffs' witnesses. In short, the proper length per pound is an indispensable identifying characteristic of the class of twine known as binder twine. In light of this fact, the length of the instant

twine becomes of central importance, not arising from the necessity of demonstrating that these particular shipments were used on the farm, but rather from the necessity of showing that the instant twine possesses those essential characteristics which the class possesses. In short, plaintiffs' failure of proof was in respect to showing that the instant twine belonged to the class of acknowledged binder twine, concerning which the witnesses possessed extensive knowledge.

■ Our assessment of the proofs submitted by the appellants is in harmony with the view expressed by the Customs Court that:

The only available proof concerning the length of the instant importations is contained in the customs laboratory report. It reveals that the samples measured less than 475 feet per pound. Accordingly, simply because the instant twine entered the same commerical channels as binder twine and aroused no complaints will not support an inference that it was of the required length for binder twine.

The court below could find no rational basis for distinguishing the instant case from the *Bob Stone Cordage* case, nor can we. The plaintiff there was confronted with the burden of proving that the imported twine, of an established length per pound less than 475 feet, was, nevertheless, of the class of binder twine chiefly used in farming operations. This court held that it was not, stating that:

* * * no witness concerned with the manufacture and distribution of the imported merchandise had any direct knowledge of its length per pound, or of the fact that any binder .twine marketed in this country fell substantially below the acknowledged standard of 500 feet per pound. They acknowledged that it would not be economically practical for farmers to use twine substantially less than the standard length per pound in baling hay with roto balers. There was no proof that twine of the proven measurements of

the imported merchandise had ever been used for binding purposes in farming operations.

The failure of requisite elements of proof in *Bob Stone Cordage* is repeated in striking and fatal aptness in the instant case. The witnesses here, as in *Bob Stone Cordage* were competent to .discuss the class of binder twine and show its chief use, but the testimony fell short in support of the contention that the importation in issue was within the purview of that class.

We agree with the Customs Court that:
* * * plaintiffs offered no proof that twine possessing the characteristics of the importation, particularly the deficient length per pound, was, nevertheless, chiefly used on the farm. The testimony, in fact, tends to support the opposite conclusion; that were its deficiencies of length known, the imported twine at issue would not be used as binder twine.

■ It is a well-established principle of customs law that the classification of the imported merchandise assailed is invested with a presumption of correctness. To overcome this presumption, appellants are charged with the burden of proving not only that the collector erred but also that the classification which they assert is correct.

On the basis of the record before us and after consideration of the arguments and briefs of counsel, we are of the opinion that the decision and judgment of the Customs Court should be, and the same is, accordingly affirmed.

Affirmed.

BALDWIN, Judge (concurring).

I concur in the result reached by Judge Almond and wish to express my reasons for so doing, especially in view of such a well-reasoned dissent.

The appellant here has the burden of proving not only that the classification made by the Collector of Customs was wrong, but that the classification urged is the correct one. In this case, that

burden amounts to proving that the imported merchandise belongs to the *particular class or kind* of twine which has as its *chief use* the *binding* of grain or stalks, or the *baling* of hay, straw or fodder. Proof of adequacy, adaptability or susceptibility of use will not be enough. Bob Stone Cordage Co. v. United States, 51 CCPA 60, C.A.D. 838 (1964). Nor will proof that the merchandise in question was *actually* used for the purpose recited in the asserted section of the statute be sufficient, although it will be relevant. United States v. Colibri Lighters (U.S.A.) Inc., 47 CCPA 106, C.A.D. 739 (1960); United States v. C. J. Tower & Sons, 26 CCPA 1, T.D. 49534 (1938).

The evidence before us is adequately summed up in the other opinions. I will not restate it except to indicate what I think it proves. On the one hand, tending to establish that the contested merchandise belongs to the class of goods intended to be imported duty-free under the statute is the evidence that the twine had the same general physical characteristics as bind*er* twine (except for length per pound), that the twine was seen entering into the same agricultural market channels, that no complaints were received from farmers concerning the twine and that the twine probably was unacceptable for other than agricultural uses.

On the other hand, clear and unequivocal, was the evidence establishing the characteristics of the class of twine intended to be duty-free by Congress. That evidence clearly establishes that the twine known commercially as bind*er* twine must have a length/weight ratio ranging from 475 to 600 or 700 feet per pound. The evidence also proves that there is another class of bind*ing* twine, known as *baler* twine, which has a lower length to weight ratio. It is also clear that *baler* twine, in its commercially acceptable form, must have a weight corresponding to from 180 to 250 feet per pound. See United States v. Geo. Wm. Rueff, Inc., 41 CCPA 95, C.A.D. 535 (1953).

The contested twine was found to possess ft./lb. ratios falling between the values of these two separate classes of bind*ing* twine. Therefore, unless it can be proved that the contested twine falls into another class of *commercially acceptable* bind*ing* twine, this appeal must fail. Of course, it doesn't, as pointed out in Judge Almond's opinion.

I have used the limitation "commercially acceptable", as I believe Chief Judge Rao did in his opinion for the lower court. It becomes a critical limitation in cases such as this. Ordinarily, where goods, both imported and domestic, are deficient in some characteristic as compared to a recognized standard, they are made commercially acceptable, for example, by discounting the price. In this case, the imported goods were deficient as compared to a recognized standard, i. e., length/weight ratio, for either of two "commerically acceptable" types of bind*ing* twine. The evidence does not show they were ever made commercially acceptable and, in fact, appears to indicate that the twine was used by the ultimate consumer, the farmer, without his ever knowing that it was deficient in any manner.

RICH, Acting Chief Judge (dissenting).

I am unable to agree with the majority that the record fails to establish that the imported twine in issue here is classifiable within the provision for "All binding twine and twine chiefly used for baling hay, straw, and other fodder and bedding materials" in paragraph 1622 of the Tariff Act of 1930, as modified.

Referring to the entry papers and testimony relative thereto, it is apparent that four of the eight entries involved in the present protests[1] included merchandise designated "binder twine" which was returned as duty-free under paragraph 1622, and was thus not subject to the present protests, in addition to the merchandise similarly designated which was held dutiable under paragraph 1005 (b) and which constitutes subject

---

1. Those entries involved in Protests Nos. 63/8538, 63/8542, 63/15930, and 64/12413.

matter under protest. With the entry papers for each protest, there is a laboratory report by a chemist for the Customs Bureau, which report sets forth the weight of ball, oil content, and feet per pound of a sample ball from the lot or lots of "binder twine" included therein. For each ball tested, the report shows a ball weight of approximately either 5 or 8 pounds and an oil content of over 8 per cent. As to each of those lots in the aforementioned four entries which was ultimately classified in paragraph 1622, the report shows a length per pound (or where two balls were sampled, an average length per pound) of 475 feet or more. As to every lot that was ultimately charged with duty under paragraph 1005 (b), the report shows a length per pound, or average length per pound, of less than 475 feet.

The testimony of Peuler and Hodapp establishes that the line examiner "did always have to have" a chemical analysis of imported merchandise invoiced as "binder twine" in order to classify it, and that the items on which the chemist was instructed to report on each sample submitted to him were those actually set out in the reports: (1) weight, (2) percentage of oil, [2] and (3) feet per pound. Peuler, characterized by the trial judge as a "very reluctant witness," conceded that "whether the footage came up to 500, give or take the 5 per cent" was a factor taken into account in determining whether a lot of twine was advisorily classified under paragraph 1622 or paragraph 1005 (b). Testifying with respect to a specific entry, Peuler stated that the balls always differ in weight, by an amount less than a pound, and agreed that the weight was not a decisive factor in the classification.[3]

In seven of the eight involved entries, the report of the examiner recommending classification in paragraph 1005 (b) includes as the explanation a statement that the laboratory test reported "less

than" 475 or 500 feet per pound or a statement that the footage per pound was a specified amount which was less than 475 feet. Five of six reports signed by Peuler are in that category. Peuler's other report merely states that the twine "does not conform to the requirements of Sec. 1622," but other papers included with that report contain notations that the twine ran less than 475 feet per pound and that it averaged 455 feet per pound.

Hodapp testified that balls of twine constituting Illustrative Exhibits 1, 2, and 3 had characteristics the same as, or similar to, those balls of twine invoiced as binder twine that came to him for analysis and were found to come up to 500 feet per pound. He was unable to say whether the balls of the exhibits ran at 500 feet per pound since that could be determined only by unwinding the ball and thereby rendering it unusable in harvesting machinery. Witnesses for the importer further testified that those exhibits had the same characteristics as the goods they made or handled as "binder twine."

It is of interest also that one of the laboratory reports, that in Protest 274662-K, signed by Hodapp, includes the statement:

TD'S 40805 and 45026 have been noted.

The significance of that statement is revealed by Geo. Wm. Rueff, Inc. v. United States, 72 Treas. Dec. 290, T.D. 49151. That case concerned T.D. 40805 in which the Treasury Department, through an order dated April 14, 1925, undertook to define "binding twine" as used in the Tariff Act of 1922 as containing approximately not less than 500 feet to the pound, from which the collector allowed a variation up to 5 per cent to make the minimum 475 feet to the pound. Considering the application of that requirement to paragraph 1622 of the 1930 Act, the Customs Court there held that, in

2. Earlier reports specified the actual amount of oil, as 13.2 per cent, but later reports merely stated that the amount of oil exceeded 8 per cent.

3. The record reveals that the twine in question was imported in "bales" which were made up of either six "8 pound" balls or ten "5 pound" balls.

the absence of it being established that twine of the kind and character in question of less than 475 feet to the pound was not chiefly used for the binding of grain, the additional requirement regarding length in the order was "an abridgement of the law" and "without legal authority." The same *Rueff* decision also cites an earlier decision with the same title, reported at 65 Treas. Dec. 740, T.D. 47033, which held that T.D. 45026, a Treasury regulation requiring that binding twine have not less than 8 per cent of oil to fall within paragraph 1622, was invalid.

I think it apparent from the foregoing that the record overwhelmingly demonstrates that, except for its testing less than 475 feet per pound,[4] the twine in issue was in all substantial respects the same as twine similarly invoiced as "binder twine" and classified under paragraph 1622. It is also clear that it was *only* because the twine in issue measured less than 475 feet per pound that it was not admitted duty-free. Thus, the question is whether such a difference in length is, on the present record, controlling of classification.

On that point, United States v. Geo. Wm. Rueff, Inc., 41 CCPA 95, C.A.D. 535 (1953), held that the recitation of "All binding twine"[5] as specified in paragraph 1622 did not preclude twine that ran about 200 feet per pound and was used in tying or baling of hay. As stated by the Customs Court in the present case, that decision indicated that paragraph 1622 "would encompass all twine made from the enumerated raw materials which did not exceed the statutory maximum of 750 feet to the pound and was chiefly used in the agricultural pursuits of tying grains or harvesting." While the Customs Court here was apparently satisfied that "binder twine" which was imported in lengths running no more than 5 per cent short of 500 feet per pound, as did that returned by the collector as duty-free under paragraph 1622, was of a class having the stated chief use, it found that there was a failure of proof by appellants, which failure was "in respect to showing that the instant twine belonged to the class of acknowledged binder twine." The reasoning that led the court to that conclusion was:

In this case, plaintiffs have marshaled an abundance of proof relating to binder twine in what can best be described as its commercially acceptable form. In this form, the twine is expected to possess certain physical qualities, among which is the requirement that it measure 500 feet per pound. The testimony reveals that this characteristic is expected by the importers, sellers, and ultimate users and is the standard aimed for by the manufacturer. Consequently, it appears that the requisite yield of twine per pound is a major characteristic of binder twine as a class, absent which such twine will not be acceptable for the uses testified to by plaintiffs' witnesses. In short, the proper length per pound is an indispensable identifying characteristic of the class of twine known as binder twine. In light of

---

4. The single ball or pair of balls taken as samples represented only a very small proportion of the total twine in the lots sampled. Thus one sample ball was tested from the 2000 bales of six 8 pound balls each making up the lot of twine under protest in 274662–K and found to measure 379 feet to the pound. In Protest 63/15930, where 2 sample balls were taken from the lot of bales made up of six 8 pound balls classified under paragraph 1005(b), one ball measured 487 feet per pound but the second measured 459, bringing the average to 473 feet per pound, under the standard of 475 used.

5. At the time of the importations involved in *Rueff*, paragraph 1622 merely specified "All binding twine manufactured," etc. and did not include "and twine chiefly used for baling hay, straw and other fodder and bedding materials," which now appears between "twine" and "manufactured." At the time of its decision, the court was aware that Congress had since so amended the paragraph and concluded that such amendment was intended only to clarify the original language, not to alter its scope.

this fact, the length of the instant twine becomes of central importance, not arising from the necessity of demonstrating that these particular shipments were used on the farm, but rather from the necessity of showing that the instant twine possesses those essential characteristics which the class possesses.

In my opinion, the court and the majority are clearly in error in holding that the imported twine must meet their strict definition of the term *"binder twine,"* requiring as a necessary characteristic a yield of at least 475 feet per pound, in order to be of a class of twine fitting within the provision for "All *binding* twine, and twine chiefly used for baling hay" [my emphasis] etc., set out in paragraph 1622. The court apparently considered the evidence that importers, sellers, and economy-minded users *expect* and *desire* twine running 500 feet per pound to require the conclusion that twine of less than that length "will not be acceptable" for the uses testified to by appellants' witnesses. However, the evidence reveals that, as a practical matter, the imported twine was sold and used in the same manner even if it was found by Customs to run less than the minimum of 475 feet per pound and therefore held dutiable.

In an analysis of the evidence with which I am in full agreement, the Customs Court stated:

> The witnesses testified that the instant twine was entered into the same commercial channels whether or not it was accorded duty-free status. The sales of this twine were made to twine wholesalers, large retailers, farm implement and feed dealers, and organizations of farmers.

Extensive testimony was offered regarding the ultimate use of twine entered in the above-mentioned channels. The nine witnesses connected with its importation and sale were in agreement that it was used on the farm for the binding and tying of grains. They based their statements either on the fact that the channels in which they sold their twine were such as catered to the needs of farmers or on the actual observation of binding twine in use in roto baler machines in the course of their business travels. The area covered by such observations extended over the full length and breadth of the major farm areas of the United States.

However, it is apparent that the court failed to appreciate the significance of that testimony in establishing the imported twine to be of a class chiefly used in "the agricultural pursuits of tying grains or harvesting" and thus fall within the provision for "All binding twine, and twine chiefly used for baling hay," etc. in paragraph 1622. The testimony constitutes convincing evidence that the twine invoiced as "binder twine" and denied duty-free entry in the present case is chiefly used in the same manner,[6] and belongs to the same class, as similarly invoiced goods returned as duty-free under paragraph 1622. The other express requirements of paragraph 1622 also being satisfied, the presently involved twine cannot be excluded from the same class as the twine admitted duty-free simply because of its testing less than 475 feet per pound. The fact that twine of 500 feet per pound is considered by the industry to be the most economical and is therefore preferred loses all practical significance in view of the estab-

6. The sole uses described by the witnesses are in binding grain in grain binders and in the Allis Chalmers "Roto-Baler," which uses twine running as great as 500 feet per pound or more, for *baling* harvest materials such as hay and straw. Although there is testimony that binders are still used in some parts of the country, the indication is that such binders have been largely supplanted by the combine.

Thus the chief use of the class of goods involved here may be regarded as in the rotary baler, thus bringing the present imports in obvious compliance with the recitation in paragraph 1622 of "twine chiefly used for baling hay, straw, and other fodder and bedding materials" as well as the expression "All binding twine."

lished practice of actually marketing and using the twine in a manner independent of the possibility that the length may on some occasions be less than preferred.

As I view the present case, it is readily distinguished on the facts from Bob Stone Cordage Co. v. United States, 51 CCPA 60, C.A.D. 838, held by both the Customs Court and the majority to be controlling. There the court found an absence of satisfactory proof that the imported twine, yielding less than 500 feet per pound, "was a type of twine chiefly used in agricultural pursuits for binding purposes," but the finding was based on a decidedly different record.[7] Thus, the record led to the conclusion in that case that "[t]here was no proof that twine of the proven measurements of the imported merchandise had ever been used for binding purposes in farming operations." Also it was found that, while the record showed the principal area for consumption of the twine was the entire Middle West, "the observations of the witnesses were limited to the states of Nebraska, Oklahoma, Kansas, Arkansas, Missouri and Iowa." Whereas it was concluded on the *Bob Stone* record that twine, "whether it be manufactured and distributed as binding twine or baler twine," is susceptible to use for varied purposes in "industry and commerce in general" as well as agriculture, the record here presents persuasive evidence that the twine in question was of a class used *exclusively* for agricultural purposes.[8] The decision in *Bob Stone* did not rest merely on the feet-per-pound question, as Judge Almond's opinion here seems to imply. As was stated in *Bob Stone*, "the measurements within the

designated limit in no wise abridges the embrasure of the statute *provided the criteria of use are established.*" (My emphasis.)

I would reverse the judgment of the Customs Court.

LANE, Judge (dissenting).

I agree with the dissenting opinion of Judge Rich. I add that it is my belief that the evidence as to a commercial expectation of a given footage range should not be considered at all in this case. The Tariff Act provision, paragraph 1622, has fixed the footage limits as "not exceeding seven hundred and fifty feet to the pound." Since Congress has thus expressly spoken on length per pound, I find it inappropriate for a court to ground its decision even in part on evidence tending to show a lower limit that would be commercially acceptable. I do not say that evidence of a lower footage is totally irrelevant in all cases under this provision. Such evidence might show in a given case that the twine, due to its thickness, cannot be used for binding or baling as required by the statutory paragraph in issue. Such a situation is clearly not present here. The evidence clearly shows a binding or baling use for the imported merchandise. The footage evidence does not negate that fact and has no proper relevance in this case. To give the footage evidence any weight, as the opinions of Judge Almond and Judge Baldwin have done, is to allow commercial expectations to eliminate two-thirds of the scope of the provision given us expressly by Congress.

7. Counsel for the parties were aware of the *Bob Stone* decision at the trial in the present case and it is apparent that appellants were endeavoring to avoid the evidentiary deficiencies found to exist in that case.

8. The evidence indicates that a significant reason for that circumstance is that the oiled condition of the twine renders it unsuitable for other uses.